I come to the court with the burden of argument for half a million of our soldiers active and retired duty, families, spouses, women, children, because it was half a million people whose data was stolen from Tri-West facility. And I'm not going to say this was the second break-in without other security being placed to the other. I have one factual question that wasn't clear to me from the record. When you say the hard drives were stolen, did somebody go in to a chassis and take out the hard drive, or did they just take the whole chassis? My understanding is they walked in, the thieves got in unimpeded and left with all the computers. So they took a computer which had a hard drive in it, but they didn't take out a hard drive. Well, we don't know what they did. In fact, that's the question. No, no, no, I don't mean that. I mean what they took was not a discrete hard drive. Well, they took the hardware containing the hard drive. The hardware that contained the hard drive. Yes, Your Honor. And these half a million people who have served our country with dedication, who protect us and who deserve to be protected, when you say deserve to be protected, let me ask you a question that made me scratch my head. Arizona law controls, correct? What Arizona law protects an interest in the privacy of the name, social security number, address, et cetera? Is this a contractual cause of action that you brought here, a failure to perform a promise to keep the information private? Question number one. Or do you see the private information as property of your plaintiffs, which was given in bailment to TRICARE and which they negligently handled? Is this a tort cause of action or is it a contract cause of action? Well, we sued in negligence. But negligence is sort of a broad swab. It is, Your Honor. And the ‑‑ I have to clarify one important point to answer your question. And that is we're talking about military people. Military people have no more right to contract or tort than civilian people. Let's stop waving the flag. Your Honor, if I might, there is a reason why I brought that up, not for flag waving but for something else. And that is this. It's about the risk. We live in an era of terrorism. We live in an era where the Internet gets things around in one to two seconds around the world. We live in the information age. We live in an era where people can use things against you. If they get a hold of your credit, it can be ‑‑ once it's out there in cyberspace, you ‑‑ it is a permanent record that can be used for a long time. We are quite vulnerable. See, the problem with this case, I mean, this would be a much more interesting case, or at least a different case, if this was a hacker who had gone into this computer. But that isn't what happened. Somebody came in and stole a bunch of hardware. We have no clue whether that person who stole the hardware had any interest in what was on the hard drive. Yes, I'm sorry. You're pointing your finger. Thank you so much. Exactly. That's my whole point. My whole point is Al Qaeda terrorists could have gone after that hard drive. The Department of Defense has been looking vigorously for who took these. No clues. They planned their attacks for long ‑‑ over long periods of time, and these soldiers are vulnerable. Their families are vulnerable. Your remedy is going to help that. I mean, credit monitoring is not going to do anything for these people. So, if that's the problem. Well, there's a multitude of issues. The real problem is, Your Honor, I want to make sure that I understand how this case differentiates from other cases. Not only the military component. It wasn't just banking information like Social Security and date of birth. What was on that hard drive, the hard drives that were taken, included medical diagnostic data, names of physicians. But let's go back to what the legal issues in the case are. The legal issue in the case. I mean, you seem to recognize, and I think correctly, that fortunately or unfortunately, you're not going to get damages related to any of that. In other words, there is ‑‑ if the risk of any ‑‑ of people getting your medical information or of terrorism or anything else has been increased by this, and perhaps it has, you're not even asking for damages for that, and you're not going to get it. I mean, is that much common ground? Well, I have a different view. I think that ‑‑ That's not what your complaint is asking for. You're asking for credit monitoring. Exactly. Because we think that could uncover a variety of things. We think that ‑‑ I mean, the fact that this was significant, the president of the company of TriWest sent three letters within a year. That's true. And in those letters, they talked about what information was out there. Right. In terms of whether the person was active duty or not. There wasn't just one piece of information. It was a multitude of personal information. It would be helpful to me to see if we can get closer to the legal issues in the case. Okay? The legal issues in the case, as I understand it, are this. The robbery of this computer at some incremental level, which we would have to quantify, increased the risk of some of this happening. Right? Of either credit problems or some other form of identity theft or maybe people being attacked. Who knows? But people's information is now out there, possibly. But quite possibly not. For all we know, these people took the hard drive and threw it out. But possibly. So there is some incremental risk that wasn't there before. And the question for us, as I understand it, is, is that incremental risk in any fashion at all actionable in a tort case? Is that basically what we're asking? Yes. On a narrow level, yes. But I think there's a lot more at stake for society here. There's a huge public policy argument here. And that is, and that is, if TriWest doesn't have to do anything other than send letters and say, do what you want, monitor to your credit, get what you want at your expense, we've told you that all this sensitive data is out there. But in fact, the suggestions that they made, and I've been myself the object of identity theft, so I know how one does this, didn't cost anything. I mean, it's a pain in the neck. It's aggravating. But you go, they suggest that you go to the credit agencies and that you put flags on and so on, and that doesn't cost anything. So you're, so the revenue that you're looking for, and this is probably down the line in this case, were to go forward, but you're asking for, you're saying that a reasonable person would have done more than that, essentially. Well, yes, for a variety of reasons. The free flag that you get has to be renewed every three months. It's really not a practical issue. Kagan. Well, as I read the letters, yes, for some agencies, not for others. That's what the agency, that's what it said. Well, and you know, it's certainly something that you have to take your time for, and you need to. They basically said, well, we didn't protect you. It was the second time there was a break-in. Now the data's been briefed. Some of it's very sensitive about maybe even medical information and your active and non-active duty status. Do what you can or hear some suggestions, and then they put you to work and say, we made the goof up, you do it. What I'm afraid of is people say, well, gee, if we rule in our favor, it opens the floodgates to litigation. The floodgates of data and incompetence are open. This is not the first breach. This was the beginning of the known breaches. Choice point. There have been numerous other. What is to my mind? Then we have the next problem, which is we're the Ninth Circuit. We're not the Arizona Supreme Court. Can I just say one thing? Just a minute. Okay. Sorry. The Arizona courts have never recognized such a cause of action, nor has any other State court. Is that right? Not exactly. The Burns case in Arizona stands for the proposition of medical monitoring, which is a medical case. Right. In this context, the context of a informational breach, a possible informational breach, not even a so that's why I think a hacking case would be different. But this is a possible informational breach. There's no court has recognized. This is a novel case, and I think it will be cited. It's not novel. There are actually a bunch of cases around. Well, I believe that for this circuit and for this country, it is certainly this particular set of facts in this particular situation is new. But what in the public policy venue, what is to give a TriCare, a TriWest, or a Choice Point, or any of those companies or banks, where is their incentive to keep that data secret and not have somebody just have it on a laptop that's not guarded? Why aren't you talking about public policy and incentives to the Arizona legislature? The legislature has acted to, I think, enact three statutes involving the handling of this type of information. None of them have given a private right of action for damages to any person because of the mishandling. Not one of them. Now, talking about public policy, don't you think the Arizona legislature is a better forum for the determination of public policy than the Ninth Circuit? I think the Ninth Circuit is a courageous circuit that cares about the protection of its citizens. Thank you. But aren't we limited to applying Arizona law as long as we want to be true to our oath, right? Yes, Your Honor. Now, where is the public policy of the state of Arizona that makes, as a cognizable legal interest, the privacy of this information? Cite me the case. Cite me the statute. The statutes that have been passed have been criminal for, you know, damage. Right. They don't deal with a private right of action for damages at all. Which takes us back, Your Honor, to the common law. Where is the common law? Cite me Smith v. Wombat in Arizona, where the common law says there is a cognizable, legally protected interest which can be made safe by damages for the dissemination of private information. Tell me. I cannot give it to you because this is a novel question in Arizona. But what I can say is we asked, since there wasn't an answer, we believe that if we if Burns You're talking about Burns. That's a remedy for a cognizable damage, which is the ingestion of asbestos fibers into one's lungs. Right? That's a cognizable issue of common law ever since the Squibb case. Right? Well, yes, Your Honor. But, you know, we did ask that the question be certified to the Arizona Supreme Court to make a determination, and I thought that was a rare thing to do. I thought it would be appropriate, because it is a novel thing. My point is But it is odd that you filed this case in state court, in Federal court, right? Yes, Your Honor. And now you're asking us to go to state court. And I've always wondered about this. I mean, this happens frequently, and it's not just you, but Well, I can answer that. There were a number of Federal claims that were appended that we decided to move and the court had jurisdiction. I see. And then the court initially made an order that said that there was a cognizable injury and then Judge Bolton reversed herself. Right. And so we feel that the Arizona Supreme Court should weigh in. We have confidence that they would find this very significant. I mean, are you really the same once all this private data about you and your family are out there? Are you really the same the day before as after that? That's not exactly the question. I mean, as I said, it seems to me that, putting aside for the moment Judge Beyer's question about whether there's a cognizable interest, I'm willing to assume that there is one, but you – and I'm willing to assume that there's an increased risk, but not too much of one on the facts of this case, of dissemination of that information. So given the fact that there's an increased risk, but not too much of one, and then you have the question of what are the damages that you're asking. This is another thing I wanted to ask you. What – you don't say very much about what the credit monitoring system would do. You have this one expert declaration. It doesn't say very much. I should say that it's my general impression that these – this whole credit monitoring industry isn't terribly reputable itself. I'm not really clear that a reasonable person would go on and do this, but maybe that's a down-the-line issue in the case. It is. And of course, the amount of damages doesn't control the fact that there are damages, even if they're incidental. Well, not really, because in this instance, it is somewhat dependent as to whether you have any cognizable cause of action at all, whether any reasonable person would do anything in these circumstances other than what the company suggested you do. But I think the Court can take judicial notice that when someone steals your identity, it disrupts your life, and it's a nightmare. That's if someone has stolen your identity. But here, all we have – you know, it really would be better if you argue the case you've got. All right? The case you've got does not demonstrate not only that anybody has stolen anybody's identity, but that anybody has looked at the hard drive. Well, what they did by their negligence is place these half a million people in cyber uncertainty, and there is identity. All right. There is a – that's what I've been saying. There is a somewhat heightened risk. There is, and there's two separate distinct things, identity theft insurance to insure against that possibility, which has a premium. And what would you insure against? My understanding is that if somebody uses your credit, you don't have to pay it anyway. So what are you insuring against? Oh, well, it can ruin your life in this way. You apply for a mortgage. You know, credit – if you tell a mortgage company and say, you know, somebody stole my identity, I have all these black marks on there, it's not very easy to get a mortgage. There's a lot of harm to credit. So the insurance is going to get you the mortgage? People – it can – it can insure against your losses. If somebody buys $10,000 in jewelry, you've got a whole – how much of it of your life does it take up? What is the risk once you – you have a problem? Was there a tribal issue of fact as to any one of your plaintiffs that they were denied mortgage insurance? Yes, Your Honor. We didn't get – we didn't get that far in the case. But you were – you had the burden of showing as an element of your case that there was a tribal issue of fact on the element of damages. As to the stolen work and the Gattaca plaintiffs, there was no evidence that their identity had been stolen and had been – had caused them any inconvenience whatsoever. Well, I think that there – No charges against them, no mortgages denied. So – so as to them, there was no – not even a tribal issue of fact that they had been, in fact, damaged, other than their concern and their worry, right? And the reason – That's what I'm getting back is what is the cognizable tort interest which allows compensation for worry or concern? The change in their risk for their data requires prudent action to deny identity theft insurance and to – I think we've been around that. Okay. Do you want to reserve time? I do. But I have one more point I need to bring up on the Brandt case, the other plaintiff we haven't talked about him yet. Yes. There's this issue we – we – we brought forth testimony. There's the issue he had six difficulties. Within six weeks, it started with his military address in Dover, Maryland, for identity theft incidents. And that's essentially just a very straightforward causation issue as to whether the – the – Sure. If you have a – if you have a car accident, you have a preexisting condition, you have another accident the next day, it goes to the weight of your damages, not the existence of it. And here, the Court dismissed Brandt's claim. And I think it's certainly a question whether to – by probability, if those incidents were related to this breach which occurred so close in time to the event. Has there been discovery in this case at this point? Very minimal. I think there were some depositions on the – on the basic issues surrounding these motions. And because what I'm wondering with regard to Brandt is, I mean, is at any point are we going to know more than we know now about it? Oh, absolutely. If we could – if we go back and we get to the – to the Traveler's case and full-blown discovery, absolutely. We need that opportunity. Of what? I mean, they don't know what happened to the – to the – to the documents. So what are you going to do discovery of as a hard drive? What are you going to discover? Well, no. We – we don't know, which in fact is even more dangerous to our clients. The fact that we don't know where that data is. What's the reason? I understand that, but I'm asking you what facts are going to be developed down the line in this case that would be helpful to you? We can do more determination of the discovery and go through the records and the custodians of the places and follow the path of the different type of breaches suffered by Mr. Brandt. We could certainly get deeper into that, which we did not have an opportunity to do. In other words, you can't do any more discovery with regard to the – the company and the breach, but you could do more with respect to Mr. Brandt's – Well, we don't – we don't – But that's not discovery. He's your client. Yeah, we don't need to – we don't – well, we need to do more discovery as to the repositories of the information. But – but, you know, my concern is what is that data worth on the black market in this world? This – this is something we have to put a stop to and tell these companies they – they must be careful. I mean, you're talking about a lot of horribles, but we're pretty much limited to the record before us. Your Honor, the record is – before us says that identity theft is the largest, fastest-growing crime in America and in the world. It is a huge problem that we need to address and have the courage to do something about. We live in a future world that's very different than what we've had in the past, and we're – we're asking this Court to do the right thing for our military families. Thank you very much. Thank you, Your Honor. Good morning. May it please the Court. I'm Barry Halpern with the Snell and Wilmer Law Firm in Phoenix. With me is Andy Halliby and Janet Klumblatt, the general counsel of Tri-Webs. Your Honors, this lawsuit has been in our plea and has been argued to be an opportunistic lawsuit. It was filed within six weeks of a theft, a burglary at the Tri-Webs facility. Tri-Webs was the victim. The theft involved not just data, as the Court asked, hardware of all kinds, routers, computers, connections, ports and stuff. All right. So let me – I mean, there's kind of fact and there's theory in this case. I mean, so to go a little bit to the theory, suppose what we had was a hacker who went in and – so we know that this person was after the information, number one, which we don't know here. I fully understand that, that we don't know that. And suppose as well – and the two pieces of the facts that bother me here are, A, we don't know that, in fact, anybody had any interest in this data, and, B, that it isn't quite clear to me what the credit monitoring is going to accomplish. But conceptually, I mean, just high theory, would you think that if somebody went in and hacked your machine because of some negligence of yours, that you would have some responsibility to the people who are now being put to great, at least, expense in trying to – perhaps to some expense in trying to deal with that situation? Suppose we knew that somebody got someone's information, then would you have responsibility? Judge Berzon, I start by reminding the Court, because it wasn't entirely clear, that this is a common law negligence claim. I understand that. And this is what Judge Bey has been asking, and that's sort of what my question is going to be. All the other claims have been abandoned, so in response to your question, I'll look at it. So suppose you were, you know, truly negligent in how you dealt – you had a lot of negligence in the way that you dealt with the firewalls and so on, and someone got in there, got the information, and did hurt somebody. Is that any irresponsible? Your Honor, if there were, in fact, a hacker whose intentions were clearly to invade privacy and use for nefarious purposes the information, it might be a tougher case. Not necessarily. What's the interest between the – I'm sorry. Which is the common law interest under Arizona law, which your negligence would have invaded? That's an interesting question. It certainly isn't common law negligence. And what I was about to say is you still have to connect the dots. For a common law negligence claim, you've got to have a breach, and you have to have injury causally connected, even in – Well, first you have to have a status between the plaintiff and defendant, which creates a cognizable interest at law. There's an open question on the duty in a negligence action. There's certainly no causal connection in the abstract, even in Judge Berzon's hypothetical. We've got to link up the dots so that even if there were a hacker and the hacker got access to information, until something happens that is causally connected, causing damage, you have no common law negligence claim. It's just easier. This case doesn't involve a hacker. It does not. Well, why are we talking about a hacker? I asked the question because I was trying to understand whether the issue is that there's no interest here. I'm sorry, Judge. I didn't want to get in trouble, so I thought I would. Okay. I withdraw the question. Isn't the case more closer to analysis by saying that this is a contract? You agreed to hold this information and hold it confidential for your use. And you should be performing that contract other than negligently. But when you perform it negligently, you breach the contract. Judge Beyer, I suppose it's conceivable to advance a contract claim, a bailment sort of claim, as you hypothesized with counsel earlier. That's not the case here. And to the extent that there is a contract analysis, Tri-West provides health care services to 500,000-plus military personnel, dependents, and retirees. The contract is with the government, and the government has remedies were there a breach of the obligation of Tri-West to the government. Again, this is not a bailment. You would say the plaintiffs are on third-party beneficiary suit? Absolutely not under Arizona law. Under Arizona law, the standards for third-party beneficiary exposure are very, very precise. You must be a specific beneficiary designated typically in writing. It's certainly not the case here. So, and again, not to be disrespectful, but there were nine claims originally in this case. Only one remains, common law negligence. The others have been abandoned. They're not on appeal before you. What about Mr. Brandt? I'm sorry. What about Mr. Brandt? Does he allege and does he or has he proved sufficient facts to create a tribal issue of facts as to causation as to the six times when his identity has been used against him? With due respect, Your Honor, absolutely not. The only thing that Mr. Brandt's claim has going for it is a weak and attenuated temporal claim, the post-Ergo-Hawk theory that A happened, B followed, therefore A caused B. Henry David Thoreau once said that if you find a trout in a milk bottle, it's only circumstantial evidence that someone put it there, but it's pretty good evidence. Were there a trout in a milk bottle? Well, this man's identity was never stolen before. He took extreme care in destroying all paper trails. He used a shredder, as I remember the evidence. It had never been stolen before. It was stolen in December of 2002. In March of 2003, the identity theft start. Where is there even a suggestion that the thieves got this information from anything other than the theft of tri-care? With due respect, Your Honor, where is the even theoretical basis for assuming any connection at all? Well, he never had it stolen before. He gave it to tri-care. It was stolen from tri-care and shows up on his credit record on six occasions in geographically similar area. Your Honor, 500-plus thousand tri-care subscribers are in the very same position as Mr. Brandt. We may be finding more of them joining Mr. Brandt. Five years have gone by. Four years and nine months have gone by. Not a single one has come forward. Not a single one is before the Court. And Mr. Brandt has nothing to say, but after disclosing all of that information he is. But for now, the issue is really whether he gets by summary judgment. And we, for example, have a lot of case law in the employment area with regard to retaliation that regards timeliness as — if somebody is fired pretty soon after they've complained, that's enough to get them to trial. They won't necessarily win, but it's enough to get them to trial. And why isn't that true here? Your Honor, the cases are myriad. We've cited them in our brief. The temporal relationship in all of those special cases in which the temporal relationship has been found sufficient to allow the case to go forward, it is much more direct than any conceivable temporal relationship here. Mr. Brandt was a military person for quite some time. He testified in his deposition and disclosed in the course of discovery that he released that information to banks, hospitals, doctors, myriad sources. Under Arizona law, for there to be the necessary causal connection to move forward to survive summary judgment, more than what you, Judge Berzon, described as an incremental increase is required, it's got to be substantive and substantial. It's an incremental when it's only a risk. It's a risk. But once it becomes a reality, i.e., he does, in fact, have the identity theft, now the issue is a different issue. The issue is not how high is the risk that he's going to have identity theft. He's had the identity theft. The question is, just a minute, may I finish? The issue is connecting the – is the causation issue. It's not a question of whether he suffered the injury. He has suffered it. The question is whether you're responsible for it. Well, first, with due respect, the question is whether if he had some identity theft, it was in any way related to the Tri-West burglary. That is not a matter of record here. I have a friend who's a lawyer and a lawyer who's a journalist, a journalist whose records were the subject of these four or five incidents, plaintiff admits that at least one of them probably happened before. The cumulative effect of all of these little nits and gnats are in no way connected to Tri-West other than his premise. Which nits and gnats are we talking about? He claims that at some point his people made inquiries suggestive of identity theft, but they're not connected in any way to Tri-West. Well, that's a different issue. But to put down the fact that he was actually – I don't know if you've ever been the subject of identity theft, but it's damn annoying. Judge, I have been the victim of many things, including this theft at Tri-West. So I'm very sensitive to that. But wait a minute. You said that one of the six incidents occurred before the theft from Tri-West. We've noticed that in his deposition. So again, you get this – Give me a citation for that, because I was under the impression that the first identity theft, the break-in was in December 2002. The first identity theft occurred in March 2003. Let me find that for you. All right. Here. Your colleague has the answer. I knew I – I was glad Mr. Halliby was here. The GE Credit Service. There's no evidence of when it happened, and he acknowledged in his deposition – Mr. Brandt acknowledged in his deposition that that may well have happened before. So I think the salient points are these. He had an event before. He claims events afterwards. His counsel and he elected to do no discovery to link up any of those events, if possible, to do so with the Tri-West burglary that occurred thousands of miles away. They didn't file a Rule 56 affidavit saying they needed more time to make these links. And so what's left is the typical post-ergo situation. It happened afterwards, therefore it's related with due respect to the Court. There is absolutely no legal basis for making that connection, and not a single one of the cases cited by plaintiffs and in every case cited by the defense. My – my – take a look at paragraph 135 of tab 87 of the record. During the spring of 2003, an attempt to open an account with Wal-Mart GE Credit Service was made. Spring 2003 was after the theft, not before the theft. In Mr. Brandt's deposition, he testified that that may have occurred before. Well, who cares what his deposition says? The issue here under the local rules is what your statements of undisputed facts are and what the statements of undisputed facts on the other side are, and everything else is out the door. Well, let's assume that that's not true. Isn't that so? Isn't that the local rules in Arizona? That's the rule. Okay. Let's go on to another part of the argument. If I may, again, this is not the fish in the barrel case. This is not the sandwich at the swimming pool case. There is no relationship between Mr. Brandt's claimed identity thefts and the events that occurred in Arizona on the other side. In terms of having further discovery, you didn't do any discovery either with regard to – did you? I was going to say – We had nothing to discover. We – Well, you might have wanted to know what the facts were of his asserted credit identity theft incidents. We asked – we took his deposition. Yes, but you didn't go to the credit companies and start tracing back the – from the companies. Neither side did that. Your Honor, neither side did. Again, it was not our burden to make the case. We felt strongly, and Judge Bolton agreed, that there was no evidence of linkage, no causal connection. Let's go to the other issues for a minute. Why shouldn't we certify this case to the Arizona Supreme Court? I don't – I really don't have an opinion about this, and I'm not – it's not a rhetorical question. It's really that wouldn't it make more sense for the Arizona Supreme Court to decide for itself, rather than for us to decide on an interim basis until the California Supreme Court decides for itself what the – the – whether Arizona wants to extend the medical monitoring cases to this context? So the Court's question is why should you not certify? Why shouldn't we? Well, first, because – Would that be a more orderly way to proceed? I think not, Your Honor, with due respect. The case has been at issue. It was fleshed out and presented on summary judgment. I understand. I'm talking in terms of judicial – I mean, in terms of relationships among the State and Federal courts, and the fact that this is an interesting question. I mean, for example, the Seventh Circuit did go undecided on the merits, as I understand it. Should we do that, or should we just give it to Arizona to decide? Your Honor, absolutely not. First, the plaintiffs did not ask for certification until they had been – I understand. It's not – my approach to certification is really that it's really not the parties that we're doing it for. It's really for – in order to get the case decided by the institutionally competent entity. It would be a sua sponte certification because there was no prior request, despite many opportunities to do so. And the standard for certification requires a novel question. Well, this is certainly a novel question. Your Honor, I'm not sure it is. It could have been under perhaps different pleading, but as a negligence claim in which the damage sought is monitoring, the law in Arizona is very clear. It doesn't apply. This is not a novel case in Arizona. It's not a novel case under tort law. There is medical monitoring, and the reasons why this wouldn't apply, it seems to me, would have to do either with the nature of the exposure or with the nature of the damages. I mean, frankly, I have major problems with why credit monitoring is going to do anybody any good anyway and whether a reasonable person would do it. And maybe on that basis, we wouldn't certify it because we think that it wouldn't be dispositive. But still – Your Honor, the medical monitoring cases have been around in Arizona and New Jersey and several other places for about 20 years. They are very specific. They are tied to the fact, as Judge Beyes said a moment ago, that there is an actual insult. There is a physical connection. And there is a known relationship between that physical insult and the importance of early diagnosis that can't be measured in money damages. Here, if there is a claim that is causally connected to the events at TriWest, money damages would suffice. And if there ever were, the statute wouldn't have run, and each of the plaintiffs would have the opportunity to litigate it if there ever is a connection. There simply isn't now. Well, maybe yes and maybe no. First of all, I mean, some identity thieves may be after – you know, judges, for example, are very sensitive about their personal information getting out, and it's not because of identity theft. It's because we would prefer that people don't know where we live, although they do. Sure. So there are other reasons why you might not want your information out there, other than that are not economically compensable. But the credit monitoring does not help that. The question, I think, the Court's question goes to why is this different from or why is this not a medical monitoring case. There are no similarities. All right. Or let me ask you a different – there are many similarities. There are also some just similarities. The – suppose we were back in 1980 and somebody came to us with a medical monitoring case. Should we have simply said yes or no, or should we have sent it to the Arizona Supreme Court? I think that – I'm trying – what I'm pausing is because I don't remember when the case was. I think it was in 83. At least let's assume that I'm right about that. The Federal courts in diversity cases are asked to deal with challenging issues all the time. This isn't the courts of one country applying the law of another. But here you have a court that was severely chastised by the United States Supreme Court for not doing so in a case coming out of Arizona, as you know. But those specific cases relate to very finite, discreet issues of Arizona law. And each of the cases in which certification has been allowed, there is something particularly unusual and unique. That is not the case – these are fundamental questions of tort law. And the same principles applied by Judge Bolton, who, by the way, was on the Superior Court bench for nine years, was a practitioner in this area for years before that, is a well-regarded practitioner. I know Judge Bolton quite well, thank you. And her rationale has been accepted in seven reported cases, six citing her specifically and one reaching the same result. Well, it seems to me, frankly, that if you have an argument why we shouldn't certify, it would have to be really on the theory that the case is an easy case. I mean, that's the only possibility. Well, Judge, that's what I'm saying. Because medical monitoring cases were novel at one point, and I assume that if you were the defendant in one of those cases, you would have been standing up here and telling me the same thing. Except, Your Honor, and I do a lot of health care litigation, there is a lot of science involved in the causal relationship and the importance of early detection and what the significance of an insult such as asbestos might be. They're very different from a garden variety negligence case in which economic damages are at issue. There is nothing unusual. There's no science to wrestle with. There's no concept of huge public policy health care issues here. This is a garden variety negligence case in which economic damages are readily available whenever, if ever, there's a link-up between what happened at TriWest and any individual claim. Thank you, counsel. Do you have anything else? Thank you very much. Thank you. We'll give you about a minute in rebuttal. Thank you, Your Honor. I would say that even reading yesterday's New York Times, again, there's a very fascinating article about data and concerns. Information is today's gold. If gold is allowed to be out of the barrel, it certainly is a worthwhile thing to protect your gold. You would buy life insurance, even if you're healthy. You would buy credit monitoring. It's a reasonable person would buy credit monitoring and identity theft insurance, just like you would buy life insurance, because the consequences can be so life-altering if it happens. These folks had no – these service people had no choice but to give their data to TriWest for use and safeguard. And they wouldn't insure them otherwise and wouldn't process their medical bills. And they had a duty to – an incumbent duty to make sure that it was safeguarded. And Mr. Brandt is a claim representative for himself and all others. We haven't had a chance to do discovery on those other issues. As far as Latin is concerned, we believe the term used here today is a non sequitur, that basically once we've put forth evidence, which we have, that there were identity thefts of Mr. Brandt, that's sufficient to go to trial on and causation is left for the jury. It goes to the weight and sufficiency and damage. So we believe the Arizona Supreme Court should have its chance to look at this law. We – and, Your Honor, I thank you so very much for your time. Thank you, counsel. The case of Stolen Work vs. TriWest Healthcare is submitted. The Court will choose a short recess. Thank you.
judges: Gibson , Tashima, Berzon